# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| KATHRYN VOTH | CIVIL ACTION |
| VERSUS | NO. 07-4393 |
| STATE FARM FIRE AND CASUALTY INSURANCE COMPANY | SECTION "K"(2) |

## ORDER AND OPINION

Before the Court is a "Motion to Exclude Testimony of Neil Hall" filed on behalf of defendant State Farm Fire and Casualty Company ("State Farm") (Doc. 28). Having reviewed the pleadings, memoranda, and relevant law, the Court, for the reasons assigned, **DENIES** the motion.

## BACKGROUND

Kathryn Voth owned a home at 7201 Patricia Street in Arabi, Louisiana. The house, which was supported by masonry piers about 3 feet above grade, sustained damage rendering it a total loss as a result of Hurricane Katrina. The house floated off of its pier foundation, traveled across the yard, and stopped when it hit a tree. The house has been demolished, and was demolished before it was inspected by expert witnesses.

On August 29, 2005, State Farm entities provided both flood insurance and homeowner's insurance on the property. Following the hurricane, Ms. Voth filed claims with State Farm under both policies. Under the flood policy, State Farm paid Ms. Voth the coverage limits, i.e., $40,000.00 dwelling damages and $27,500.00 for personal property. Under the homeowner's policy, State Farm paid Ms. Voth $12,306.57 for dwelling damages, $500.00 for contents damages, and $1,471.25 for prohibited use. State Farm denied the remainder of Ms. Voth's claim under the homeowner's policy on the basis that the damages for which recovery was sought resulted from flood, an excluded peril under the homeowner's policy.

Thereafter Ms. Voth filed suit against State Farm seeking to recover the policy limits under her homeowner's policy as well as statutory penalties, interest and attorney' fees pursuant to La. Rev. Stat. 22:658 and La. Rev. Stat. 22:1220 for failure to timely initiate adjustment of her claim and for arbitrary and capricious failure to timely pay the amounts due under the homeowner's policy.

Plaintiff's counsel retained Neil Hall, a certified professional engineer in the state of Texas, as an expert "to determine the extent of the damage caused by the wind and flood during Hurricane Katrina." Report of Neil Hall, Doc. 28-4. Dr. Hall issued a report based on his interview with Ms. Voth, review of three sets of photographs (some of which were taken in 2006), an inspection of the area where the house had previously been located, meteorological data, and review of an expert report issued by Nash Roberts, III for the house located at 209 Genet Street, approximately 1/3 mile ESE of Ms. Voth's house. Dr. Hall's report notes the following damage to Ms. Voth's house: 1) most if not all of the windows were broken; 2) the interior of the home was inundated with water; 3) roof shingles were missing; 4) roof vents were wind damaged; 5) the roof ridge was broken; 6) the roofing over an addition to the house was almost totally missing; and 7) there was damage to the vinyl soffit. In his report Dr. Hall stated:

- field conditions in the vicinity of the Voth residence suggest that peak wind gust speed approached 115 mph;
- the FEMA inundation map shows a stillwater height of 10.2-10.8 feet above mean sea level near the Voth home;
- "flooding just west of the Voth residence did not reach 3' until about 0730 CDT and 6.5' until 0815 CDT;
- overtopping of the Forty Arpent levee moved south into Arabi between 0800 CDT and 0830 CDT";
- by 0800 and 0900 CDT flood water from the Inner Harbor Navigational Canal breach and the levee overtopping combined to inundate the Arabi area; and
- "If flood water did not reach the finished floor above the

> crawl space of the Voth resident until 0830 CDT then wind reached 95 mph sustained/125 mph gusts according to the Roberts timeline. Since the house was pushed slightly east of south into a tree trunk, it is most probable that flood water reached by finished floor at or after 0830 CDT";

Dr. Hall then concluded:

> Using the EF scale for Residential Dwellings, it is concluded that the threshold for window damage was at a time when wind speed was between 79-96 mph; the threshold for shingle blow-off was at a time when wind speed was between 63-79 mph, and the threshold for rolled roof blow-off was at a time when wind speed was between 81-97 mph. All of this damage could have occurred between 0600 CDT and 0700 CDT using the Nash Robert's timeline, or 1-2 hours before flood water crossed the railroad berm or Forty Arpent levee. It is concluded that wind damage to the roofs occurred prior to the rise of the storm surge. The attic and ceiling were damaged by water leaking through the roof and by wind pressure from wind entering along the north side of the sloped roof.
>
> There is no indication that flood water in Arabi, after overtopping the railroad berm or Forty Arpent levee, attained a current velocity greater than 5 fps. The direction which the building moved off its foundation was slightly east of west indicating a force attacking slightly west of north. This direction does not align with current flow either from the Channel breach (crossing the railroad berm) or from the Forty Arpent overflow. The direction that the building moved and the severity of impact damage is consistent with wind. The building first floated off its foundation and was pushed into the tree trunk by the force of the wind between 0830 CDT and 0900 CDT using the wind direction in the Roberts's timeline.

Doc. 28, Exhibit 1. Based on that analysis, Dr. Hall created a list of the damages caused by the wind.

State Farm moves to exclude Dr. Hall's testimony contending that his opinions are based on insufficient and incorrect facts and data and that his opinions are unreliable, speculative and therefore fail to meet the standards required under Rule 702 of the Federal Rules of Evidence and

3

*Daubert.*

LAW AND ANALYSIS

A. *Daubert* Standard

"Trial courts have 'wide discretion' in deciding whether or not a particular witness qualifies as an expert under the Federal Rules of Evidence. " *Hidden Oaks Limited v. City of Austin*, 138 F. 3d 1036, 1050 (5th Cir. 1998). Federal Rule of Evidence 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The rule reflects the Supreme Court's decisions in *Daubert*, 509 U.S. 579, 113 S. Ct. 2786 (1993) and *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167 (1999). *Daubert* charges trial courts to act as "gate-keepers" to ensure that the proffered expert testimony is both relevant and reliable. *Daubert*, 509 U.S. at 589, 592-93, 113 S. Ct. at 2795, 2796. The relevant and reliable standard announced in *Daubert* for scientific expert testimony applies to all types of expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. at 147, 119 S. Ct. at 1171.

*Daubert* provides a two-prong test for determining the admissibility of expert testimony. The court "must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592, 113 S. Ct. at 2796. Both prongs of the *Daubert* test must be satisfied before the proffered expert testimony may be admitted. *Id.* at 595, 113 S. Ct. at 2796. This analysis "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be

4

applied to the facts in issue." *Id.*

Thus, the first prong of *Daubert* focuses on whether the expert testimony is based on a reliable methodology. In determining an expert's reliability, the Court's focus "must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595, 113 S. Ct. at 2797, 125 L.Ed.2d at 484. The second prong, i.e., whether the proposed testimony will assist the trier of fact to understand or determine a fact in issue, goes primarily to the issue of relevancy. *Daubert*, 509 at 591. Indeed, this examination is described in *Daubert* as whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute. *Id., citing United States v. Downing,* 753 F.2d 1224, 1242 (3rd Cir. 1985). Federal Rule of Evidence 401 defines "relevant evidence" as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

When expert testimony is challenged under *Daubert*, the burden of proof rests with the party seeking to present the testimony. *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269 (5th Cir. 1998). To meet this burden, a party cannot simply rely on its expert's assurances that he has utilized generally accepted scientific methodology. Rather, some objective, independent validation of the expert's methodology is required. *Id.* Nonetheless, as Judge Vance stated in *Scordill v. Louisville Ladder Group, L.L.C.*, 2003 WL 22427981 at *3 (E.D. La. October 24, 2003):

> The Court notes that its role as a gatekeeper does not replace the traditional adversary system and the place of the jury within the system. *See Daubert*, 509 U.S. at 596. As the *Daubert* Court noted, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (citing *Rock v. Arkansas,* 483 U.S. 44, 61, 107 S. Ct. 2704, 97 L.Ed.2d 37 (1987)). The Fifth Circuit has added that, in determining the admissibility of expert testimony, a district court must defer to "'the jury's role as the proper arbiter of disputes between

conflicting opinions. As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.'" *United States v. 14.38 Acres of Land, More or Less Sit. in Leflore County, Miss.* 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

B. Methodology and Reliability

State Farm urges that Dr. Hall's methodology is flawed because he began his analysis with a presumption that wind, not flood, caused the damages to the Voth house. State Farm also challenges Dr. Hall's reliance on the analytical method contained in NFPA 921, a "Guide for Fire and Explosion Investigations, contending that method is unreliable because the NFPA 921 protocol is inapplicable to hurricane damages.

The use of the scientific method described in NFPA 912, a document directed toward the investigation of arson and explosion cases, does not invalidate the methodology used by Dr. Hall. The "Basic Methodology" section of NFPA 921 states that "[t]he systematic approach recommended is that of the scientific method, which is used in the physical sciences . . . The scientific method is a principle of inquiry that forms a basis for legitimate scientific and engineering processes, including fire incident investigation." Doc. 28, Exhibit 6-B. It is clear that the scientific method described in NFPA 921 is not specific to fire or explosion investigation, and is applicable in this case involving hurricane damage.

During his deposition, Dr. Hall testified that he used the "scientific method" to determine what damage was caused by wind and what damage was caused by flood. Document 35, Exhibit 5, p. 49. He described that method as follows:

> The scientific method I employ as always begins with an understanding of a hypothesis which we call the research hypothesis, which is an –which is a possible cause of the damage. And then there are other hypotheses listed, which are called null hypotheses, which

6

> are opposite causes that are to be considered. Then an analysis is performed.
>
> The initial determination to pick those hypotheses is based on data collection, which may be data that's collected before going to the field or data collected after going to the field. At this point in time, I generally pick the hypotheses before I go to the field based on my familiarity with the area and with Hurricane Katrina. After the analysis, the determination is reached, after both inductive reasoning and deductive reasoning as to what is the cause and as to what is not the cause.

*Id.* at 50. Thereafter Dr. Hall further explained:

> In the beginning of Katrina, that is exactly how I performed the analysis. At a point in time I realized it doesn't matter whether I start with wind or start with flood, because at the end of the day, I have to provide an analysis of both, you might as well plug in wind or flood just to get the analyses moving.
>
> Based on my experience in the field and the reports I've written, I created a presumption that there was wind damage as No. 1 on the top of the short list, which was wind and flood as the two causes. But you still have to confirm wind, you still have to deconfirm flood. The same analysis would be conducted if you started with flood and then added wind as the null hypothesis.

*Id*. at 51-52. Dr. Hall concedes that where both wind and flood acted on a house during Hurricane Katrina, he begins his damage causation analysis with the presumption that wind damaged the house. However, he noted that such a presumption is "without prejudice because I am knowledgeable that during the course of the analysis, if the first decision to put wind over flood is incorrect, it will come out in the analysis. *Id.* at 52.

Dr. Hall's decision to begin his analysis with a research hypothesis of wind damage and a null hypothesis of flood damage does not corrupt his use of the scientific method or render his methodology flawed and unreliable. Identifying wind as the research hypothesis does not mandate a finding that wind caused the damage being analyzed. Even when wind damage is the research

7

hypothesis, before reaching a conclusion of wind damage, Dr. Hall must still find facts which support that conclusion and are not wholly inconsistent with a finding of flood damage and must "deconfirm" that flood is not the cause of the damage. It is within the province of the jury, not the *Daubert* gatekeeper, to analyze and weigh an expert's findings to determine whether they do in fact support his conclusion." *See Daubert*, 509 U.S. at 595, 113 S. Ct. at 2797, 125 L.Ed.2d at 484. The methodology used by Dr. Hall is acceptable under *Daubert.*

State Farm also contends that Dr. Hall's opinions should be excluded because they are based on speculation and "bad facts." Dr. Hall formulated his opinions after speaking with Ms. Voth, reviewing photos of the house taken after the storm in 2005 and 2006, and reviewing weather event data collected and analyzed by others, including Nash Robert, III and the Corps of Engineers. State Farms faults Dr. Hall for not taking field notes, not documenting his "inspection" of the property where the Voth house was located, not recalling at his deposition when the inspection took place, having no specific recollection of the inspection of the Voth home, and doing nothing "scientific."

Neither Rule 702 of the Federal Rules of Evidence nor *Daubert* require specific actions to be taken to validate the investigation done by an "expert" witness. State Farm's criticisms of the investigation go to the weight to be accorded to Dr. Hall's testimony, not the admissibility of the testimony. As noted previously, the Court's role as gatekeeper:

> does not replace the traditional adversary system and the place of the jury within the system. *See Daubert*, 509 U.S. at 596. As the *Daubert* Court noted, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means fo attacking shaky but admissible evidence." *Id*. (citing *Rock v. Arkansas,* 483 U.S. 44, 61, 107 S. Ct. 2704, 97 L.Ed.2d 37 (1987)). The Fifth Circuit has added that, in determining the admissibility of expert testimony, a district court must defer to "'the jury's role as the proper arbiter of disputes between conflicting opinions. As a general rule, questions relating

> to the bases and sources of an expert's opinion rather than its admissibility and should be left for the jury's consideration.'" *United States v. 14.38 Acres of Land, More or Less Sit. in Leflore County, Miss.* 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

*Scordill v. Louisville Ladder Group, L.L.C.*, 2003 WL 22427981 at *3. The jury will have the opportunity to determine whether Dr. Hall's alleged omissions with respect to his investigation of the causation of the damage to Ms. Voth's home warrant disregarding Dr. Hall's trial testimony or lessening the weight to be accorded to that testimony.

The same analysis applies to State Farm's contention that Dr. Hall's testimony should be excluded because his conclusions are based in part on incorrect facts. Relying in part on photographs indicating that almost all of the windows of Ms. Voth's were broken, Dr. Hall opined that damage to the windows was caused by Hurricane Katrina. He then used that conclusion to determine that other damages to the house resulted from wind driven rain which entered the house due to the broken windows. During Dr. Hall's deposition, State Farm pointed out him that photographs of the house taken in September 2005 and November 2005 show fewer broken windows than do the photographs taken in 2006. Thereafter Dr. Hall stated that "it looks like the majority [of the windows] were not broken in 2005" and conceded that some force after the storm broke windows in the house. Based on that information he altered his opinion with respect to damages caused by wind driven rain stating that his opinion would not be that all of the damage to window glazing was due to wind damage.

Although it is clear that Dr. Hall relied on incorrect information in forming some of his opinions, that does not render all of his opinions inadmissible, especially, where as here, he has modified his opinion to take into account the actual facts. The original reliance on the incorrect facts

9

goes to the weight of his testimony not the admissibility of the testimony itself.

State Farm further challenges Dr. Hall's testimony contending that his opinions regarding causation of damages are based on "rank speculation." Specifically, State Farm focuses on the fact that Dr. Hall's report states that he doesn't know how much damage could have been caused by wind independent of flood because flood water was also involved, but that for estimating purposes, he attributes the cost of sealing and repainting all walls in the house to wind. When questioned at his deposition regarding that statement in his report he testified:

> I don't know exactly, but I know that the amount of wind damage was greater than zero; and in my experience, reasonably, the cost of sealing and repainting the walls would be an approximate cost of the wind damage that was caused before flood water got there. Therefore, to provide guidance to a cost estimator, I added that sentence. But I made it clear it wasn't based on a factual understanding. It was based on my experience in the field.

Doc. 28, Exhibit 2, pg. 56-59. The fact that Dr. Hall cannot pinpoint the specific damage resulting from the wind does not mandate excluding his entire testimony. The jury is entitled to rely on Dr. Hall's expertise should it elect to do so. Additionally, there may well be other evidence at trial that will enlighten the jury on this point. The jury will ultimately reach a decision as to whether Ms. Voth's house sustained wind driven damage, and if so, the amount of that damage, but it will make that decision after hearing all of the evidence, not just the testimony of Dr. Hall.

State Farm's motion contends that because Dr. Hall is not a licensed professional engineer in Louisiana and is rendering "engineering" opinions in this case, that he is engaged in the unlawful practice of professional engineering in Louisiana in violation of La. Rev. Stat. 37:681-703, and therefore his opinions are unreliable. State Farm points to the fact that Giddings Emery, a professional engineer in Louisiana, has affixed his professional engineer stamp to the report in this

case to support its claim that in offering his expert opinion in this case, Dr. Hall has engaged in the unlawful practice of engineering. State Farm further asserts that the use of Mr. Emery's professional engineering stamp on Dr. Hall's expert report cannot rehabilitate that report and render it reliable.

Nothing in Rule 702 or *Daubert* requires that an expert be licensed in a state to provide expert testimony in that state. State Farm has not cited a single case where Dr. Hall, or any other expert, has not been accepted as an expert witness, due to the lack of a license in the state where he is sought to be recognized as an expert witness. In fact, the opposite is seemingly true with respect to Dr. Hall, who plaintiff notes has never been rejected as an expert witness in any court and has been accepted as such more than 30 times. Although the lack of a lack of a professional engineering license in Louisiana is a factor that the jury is free to consider in determining the weight to accord to Dr. Hall's testimony, it is not determinative of the admissibility of that testimony under *Daubert.* Moreover, this case is not the proper venue in which to determine whether Dr. Hall is engaged in the unlawful practice of professional engineering and whether Mr. Emery is properly placing his stamp on Dr. Hall's reports. Accordingly, the motion is DENIED.

New Orleans, Louisiana, this 17th day of February, 2009.

STANWOOD R. DUVAL, JR.
UNITED STATES DISTRICT JUDGE